UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| v. | NO. 14-061 |
| MELVIN JOSUE AVELAR-CASTRO | SECTION "F" |

ORDER AND REASONS

Before the Court is Melvin Josue Avelar-Castro's motion to dismiss the indictment. For the reasons that follow, the motion is DENIED.

**Background**

Members of the Immigration and Customs Enforcement's New Orleans Fugitive Operations Team were conducting a "Knock and Talk" at 829 Grove Avenue, in Metairie, Louisiana on November 5, 2013. When the team knocked on the door to the residence, Mario Rodriguez-Meraz -- the team's purported target -- answered. The team reported that, after the officers identified themselves, Mr. Rodriguez-Meraz invited them in.[1]  While inside, the team encountered the defendant, Mr. Rodriguez-Meraz's roommate, Melvin

---

[1] Mr. Avelar-Castro's ICE Form I-213 states: "The officers were greeted at the door by the primary Target, Mario RODRIGUEZ-Meraz. The officers identified themselves and advised the Target that they were conducting an investigation that led the officers to his address. The Target completely opened his door and advised the officers to enter his residence." Mr. Avelar-Castro disputes the agents' account of consent.

1

Josue Avelar-Castro, and questioned him about his immigration status.  When it was determined that he was illegally in the country, Mr. Avelar-Castro was arrested, as was Mr. Rodriguez-Meraz.  That same day, Mr. Avelar-Castro's pre-removal order was reinstated and ICE issued a warrant for Mr. Avelar-Castro's removal.  He was transported to South Louisiana Correctional Center in Basile, Louisiana, where ICE houses immigrant detainees it arrests.

About one month later, the U.S. Probation Office petitioned this Court for an arrest warrant; the Probation Office alleged that Mr. Avelar-Castro violated the terms of his supervised release, in connection with his sentence in Criminal Action Number 11-20,[2] when he illegally returned to the United States and his illegal presence was discovered during the Knock and Talk in Metairie.  The arrest warrant was issued the next day.

Meanwhile, on December 10, 2013, Mr. Rodriguez-Meraz was

---

[2]In Criminal Action Number 11-20, Melvin Josue Avelar-Castro appeared before this Court for sentencing on June 22, 2011, after he pled guilty to illegal reentry of a removed alien, in violation of 8 U.S.C. § 1326(a).  He was sentenced to serve 10 months in prison, followed by a three year term of supervised release, and he was ordered to pay a $100 special assessment fee. As special conditions of supervised release, after he completed his prison term, it was ordered that Avelar-Castro be surrendered to ICE custody for removal proceedings consistent with the Immigration and Nationality Act and, if deported, not to reenter the United States without prior written permission of the Secretary of Homeland Security; if he reenters the United States within the term of supervised release, he is to report to the nearest U.S. Probation Office within 72 hours.

deported to Honduras.  Almost two months later, on February 3, 2014, Mr. Avelar-Castro made his initial appearance before a U.S. magistrate judge.  Two days later, the government filed a rule to revoke the defendant's supervised release.  The defendant appeared for his revocation hearing on March 26, at which time defense counsel requested a continuance to investigate whether Mr. Avelar-Castro's rights had been violated.  The Court continued the revocation hearing, and ordered counsel to submit papers addressing whatever issues defense counsel's investigation had revealed.  Two days later on March 28 -- almost five months after Mr. Avelar-Castro's arrest -- Mr. Avelar-Castro was indicted for illegal reentry by a previously deported alien, in violation of 8 U.S.C. § 1326(a), in Criminal Action Number 14-61 "G".  Criminal Action Number 14-61 has since been transferred to this Section of Court; the pretrial conference is presently scheduled for July 30, 2014 and the jury trial is scheduled for August 18, 2014.

   The defendant now contends that his Fifth Amendment right to Due Process and his Sixth Amendment right to compulsory process have been violated by the government's almost five-month delay in seeking an indictment during which time Rodriguez-Meraz -- a witness whom the defendant insists would testify that he did not give his consent to enter his residence -- was deported back to

Honduras.[3]

I.

Mr. Avelar-Castro seeks to dismiss the indictment on two (related) grounds: (1) the government unreasonably delayed in seeking an indictment, in violation of his Fifth Amendment right to due process; and (2) the government deported a material witness, in violation of his Sixth Amendment right to compulsory process.

A.

"No person shall ... be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.

"[T]he court may dismiss an indictment ... if unnecessary delay occurs in: (1) presenting a charge to a grand jury ...." Fed.R.Cr.P. 48(b)(2). The statute of limitations provides the primary protection against pre-indictment delay. See United States v. Lovasco, 431 U.S. 783, 789 (1977)(noting that preindictment delay is "wholly irrelevant ... as far as the Speedy Trial Clause of the Sixth Amendment is concerned."); see also United States v. Smith, 487 F.2d 175, 177 (5th Cir. 1973)(citation omitted)("[A]bsent a showing of extreme prejudice amounting to a Fifth Amendment denial of due process, the commencement of prosecution is controlled exclusively by the applicable statute of limitations."). But the Fifth Amendment Due Process Clause plays "a limited role

---

[3]The Court previously granted the defendant's request for oral argument, but denied without prejudice his request for an evidentiary hearing.  See Order and Reasons dated May 30, 2014.

... in protecting against oppressive delay." Lovasco, 431 U.S. at 789 (holding that prosecuting a defendant after investigative delay does not deprive him of due process, even if the defendant was somewhat prejudiced by the time lapse).  For pre-indictment delay to violate due process, the accused bears the burden of showing that (1) the delay was intentionally brought about by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution, or for some other bad faith purpose;[4] and (2) the delay caused actual, substantial prejudice to the accused's defense.  United States v. Crouch, 84 F.3d 1497, 1523 (5th Cir. 1996)(en banc), cert. denied, 519 U.S. 1076 (1997).  To show prejudice, "the defendant must offer more than mere speculation of lost witnesses, faded memories or misplaced documents; he must show an actual loss of evidence that

---

[4] Due Process requires dismissal of an indictment filed within the statute of limitations only if the defendant shows that the government's delay in bringing the indictment was a deliberate device to gain an advantage; the U.S. Supreme Court distinguishes investigative delay from tactical, or bad faith, delay:

> [I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused" precisely because investigative delay is not so one-sided.  Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.

Lovasco, 431 U.S. at 795 (internal citations and footnote omitted).

would have aided the defense and that cannot be obtained from other sources." United States v. Jackson, 549 F.3d 963, 969 (5th Cir. 2008)(quoting United States v. Gulley, 526 F.3d 809, 819-20 (5th Cir. 2008), cert. denied, 555 U.S. 867 (2008)). Notably -- given that the accused must show actual, and not merely speculative, prejudice -- the Fifth Circuit has instructed that

> in all but the very clearest and most compelling cases, the district court, rather than grant ... a motion [to dismiss the indictment] prior to trial, should carry it with the case, and make the determination of whether actual, substantial prejudice resulted from the improper delay in light of what actually transpired at trial.

Crouch, 84 F.3d at 1516; Gulley, 526 F.3d at 819-20.

*B.*

Although Mr. Avelar-Castro refers generically to the unreasonable delay between his arrest and indictment as one constitutional ground entitling him to relief, he more specifically targets Mr. Rodriguez-Meraz's deportation and the testimonial evidence of which he claims he is deprived as a result. Determining whether a due process violation has resulted from pre-indictment delay and resolving whether there has been a violation of an accused's Sixth Amendment right to compulsory process are similar inquiries: they are both prejudice and, in most Circuits, bad faith, inquiries.

The Sixth Amendment guarantees a criminal defendant compulsory process "for obtaining Witnesses in his favor." U.S. CONST. amend. VI. Compulsory process gives criminal defendants "the right to the

government's assistance in compelling the attendance of favorable witnesses *at trial* and the right to put before the jury *evidence that might influence the determination of guilt*." Pennsylvania v. Ritchie, 480 U.S. 39, 55-56 (1987)(emphasis added).  When the government deports an illegal alien before defense counsel has the opportunity to interview the alien, the constitutional right of compulsory process is implicated. See United States v. Valenzuela-Bernal, 458 U.S. 858, 866 (1982); Cf. Arizona v. Youngblood, 488 U.S. 51, 55 (1988)(citing Valenzuela-Bernal and acknowledging cases addressing loss of evidence attributable to the government in "what might loosely be called the area of constitutionally guaranteed access to evidence").

The mere fact that the government deports illegal alien witnesses, thereby making them unavailable to the defense, is not sufficient, standing alone, to show a violation of the compulsory process clause. Valenzuela-Bernal, 458 U.S. at 86-89 (acknowledging the tension between the Sixth Amendment and the Executive Branch's responsibility to faithfully execute the immigration laws that require prompt deportation of illegal aliens).[5]  Instead, most U.S.

---

[5] In Valenzuela-Bernal, the defendant requested dismissal of his indictment on the ground that the government deported two witnesses before they could be interviewed by the defense; defendant contended that this violated his Fifth Amendment right to due process and his Sixth Amendment right to compulsory process. The district court denied the motion, and the defendant was convicted.  The Ninth Circuit reversed the conviction, reasoning that the government's deportation of two alien witnesses before the defendant could interview them violated his Sixth and Fifth

Circuit Courts of Appeals have instructed that, to prove a violation of the compulsory process clause, the defendant must (1) make "a plausible showing that the testimony of the deported witness would have been material and favorable to [the] defense in ways not merely cumulative to the testimony of available witnesses"; and (2) show bad faith on the part of the government in deporting the witness.[6]

---

Amendment rights. The Supreme Court granted certiorari. The high court noted that the Sixth Amendment does not guarantee the defendant the right to secure testimony of all witnesses; rather, "it guarantees him 'compulsory process' for obtaining witnesses in his favor." Id. The Supreme Court held that the defendant must make some plausible showing of how the absent witness's testimony would have been both material and favorable to his defense. Id. The same materiality requirement applied to proving due process violations. Id. (noting that "determinations of materiality are often best made in light of all of the evidence adduced at trial [such that] judges may wish to defer ruling on motions until after the presentation of evidence").

    It is worth noting that the Supreme Court expressly stated:

> As in other cases concerning the loss of material evidence, sanctions will be warranted only if there is a reasonable likelihood that the testimony could have affected the judgment of the *trier of fact*. See Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Id. at 873-74 (emphasis added); see also United States v. Damra, 621 F.3d 474, (6th Cir. 2010)(observing that Valenzuela-Bernal stands for three propositions, the third of which is that "no sanction (such as dismissal of the indictment) is merited unless there is a 'reasonable likelihood that the testimony could have affected the judgment of the trier of fact[.]'").

[6]United States v. Damra, 621 F.3d 474, 487 (6th Cir. 2010); United States v. DeLaCruz Suarez, 601 F.3d 1202, 1212-13 (11th Cir. 2010); United States v. Chaparro-Alcantara, 226 F.3d 616, 624 (7th Cir. 2000); United States v. Pena-Gutierrez, 222 F.3d 1080, 1085 (9th Cir. 2000); United States v. Iribe-Perez, 129 F.3d 1167,

The Fifth Circuit has applied the first element of this test, and acknowledges that other courts apply a second, bad faith element. United States v. Gonzales, 436 F.3d 560, 578 (5th Cir. 2006)(noting that "[t]his circuit has not yet fully defined the contours of a claim under Valenzuela-Bernal"). However, the Fifth Circuit has left open whether or not it will "ever adopt[] the second prong, requiring a showing of bad faith by government officials."  Id.  Nevertheless, in Gonzales, the Fifth Circuit noted that the Seventh, Ninth, and Tenth Circuits require that the defendant establish, as a second element, bad faith on the part of the government. The panel in Gonzales also cited to United States v. Sierra-Hernandez, 192 F.3d 501, 503 (5th Cir. 1999), in which another panel of the Fifth Circuit had "discussed the first prong, acknowledged the existence of the second prong, and held there was no [constitutional] violation, noting that neither prejudice nor

---

1173 (10th Cir. 1997); United States v. Dring, 930 F.2d 687, 693-94 (9th Cir. 1991); Buie v. Sullivan, 923 F.2d 10, 11-12 (2d Cir. 1990).
   In requiring bad faith, these Circuit Courts of Appeals emphasized language in Valenzuela-Bernal ("immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's *good faith* determination that they possess no evidence favorable to the defendant in a criminal prosecution" (emphasis added)), or generally read Arizona v. Youngblood, 488 U.S. 51 (1988) -- in which the Supreme Court held that the failure of police to preserve potentially useful evidence did not deny the defendant due process absent defendant's showing of bad faith on the part of police -- as adding a requirement that a defendant arguing a violation of his right of compulsory process (or any constitutional violation involving the loss of potentially exculpatory evidence), show that the government acted in bad faith.

lack of good faith was shown, but not expressly stating that the failure to show lack of good faith was of itself fatal to the claim." See id.; see also United States v. Calderon-Lopez, 268 Fed.Appx. 279, 291-92 (5th Cir. 2008)(declining to address whether the government deported witness in bad faith because the defendant failed to satisfy the materiality/favorability prong).  Thus, although "it remains unclear whether, in this Circuit, bad faith on the part of the government must be demonstrated," United States v. Tian Lei Tang, No. 12-158, 2014 WL 1116982 (W.D. La. Mar. 18, 2014), it is worth noting that, since Gonzales, the Sixth and Eleventh Circuits have followed the lead of the Seventh, Ninth, and Tenth Circuits in requiring that the defendant prove bad faith on the part of the government to prove a constitutional violation. United States v. Damra, 621 F.3d 474, 487 (6th Cir. 2010); United States v. DeLaCruz Suarez, 601 F.3d 1202, 1212-13 (11th Cir. 2010).

II.

Mindful of these constitutional principles, the Court is compelled to observe a competing principle that applies to the particular context of this case and the remedy that the defendant requests.

This Court is confronted with a defendant charged with illegally reentering the United States after having previously been removed, in violation of 8 U.S.C. § 1326(a); a status crime.  To prove a violation of this statute, the government must show that

Mr. Avelar-Castro is an alien previously removed from the United States, who is found in the country again without lawful consent. His illegal status and presence in the country is evidence against him.

Mr. Avelar-Castro contends that the government unduly delayed in indicting him, or otherwise failed to comply with its duty to keep Mr. Rodriguez-Meraz in the country as a material witness; Avelar-Castro contends that he has lost the benefit of the testimony of his former roommate, Rodriguez-Meraz, whom he believes would have testified that he did not give his consent to the officers to enter his residence. Most notably, Mr. Avelar-Castro urges that:

> Mr. Rodriguez-Meraz's testimony was not literally "destroyed," but the Government's deportation of the witness and delay in indicting the defendant made it impossible for the defendant to avail himself of that testimony by presenting it to this Court *in support of a motion to suppress* his statements, his fingerprints, and his arrest based on the Government's unlawful entry into his home....

(emphasis added). But it is this context that removes Mr. Avelar-Castro's circumstances from the reach of the case literature just outlined. In fact, Mr. Avelar-Castro could not succeed on a motion to suppress his identity, identifying characteristics, or immigration file. The U.S. Court of Appeals for the Fifth Circuit has held that this information is not suppressible.

As the government points out, "[a]n illegal arrest, without more, is neither a bar to subsequent prosecution nor a defense to

11

a valid conviction."  United States v. Pineda-Chinchilla, 712 F.2d 942, 943 (5th Cir. 1983)(per curiam)(citations omitted).[7]  In fact,

---

[7] In Pineda-Chinchilla, the Fifth Circuit articulated the issue presented:

> If an illegal arrest brings to the attention of the authorities the fact that an individual is present in the United States and a subsequent check of independently created and maintained records indicates that the individual is an illegal alien, must the independent government records be suppressed as the product of the illegal arrest because they are "the fruit of the poisonous tree"?

The court answered no. Id.  The Fifth Circuit also noted that the Ninth Circuit held that "there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence."  Id. at 944 n.1 (quotation and citations omitted) (citing United States v. Orozco-Rico, 589 F.2d 433, 435 (9th Cir.), cert. denied, 440 U.S. 967, 99 S.Ct. 1518, 59 L.Ed.2d 783 (1978)). Although the Fifth Circuit "neither adopt[ed] nor reject[ed] the Ninth Circuit's reasoning", during oral argument, the government pointed out that the Ninth Circuit case is on all fours with Mr. Avelar-Castro's, in which even if his roommate refused consent and his arrest was illegal, he has no suppression remedy; likewise, the Ninth Circuit considered, and rejected the defendant's argument that his constitutional rights were violated when the government deported witnesses whose testimony would have impeached the border patrol agents' testimony relative to an illegal stop; the court held that no evidence relevant to the status offenses of which he was charged was tainted and, thus, defendant could not have benefitted from the testimony of other aliens bearing solely on the claimed illegality of the stop. See Orozco-Rico, 589 F.2d at 435 (noting that "[d]efendant was prosecuted for status-type offenses. His mere presence in our country, as an illegal alien and as a former deportee, was sufficient to constitute the offenses with which he was charged. [But] the stop, even if illegal, was the not the source of any evidence that could have been suppressed. Because there was nothing to suppress, any testimony by the returned aliens relevant to the legality of the stop would not have helped him.").  Indeed, like other cases decided by those Circuits endorsing a blanket rule that a defendant's identity–and any evidence related to that identity–is never suppressible, the case

the Fifth Circuit has expressly held that "a defendant's [immigration] file need not be suppressed because of an illegal arrest." United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir. 1999)(affirming denial of defendant's motion to suppress his identity and his immigration file where defendant was charged with illegal reentry).

The genesis of this line of authority is United States v. Lopez-Mendoza, 468 U.S. 1032, 1040 (1984), in which the U.S. Supreme Court observed that "[t]he 'body' or identity of a defendant or a respondent in a criminal or civil proceeding is never itself suppressible as the fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred."  This line of thought has generated much debate, and a Circuit split.  But the Fifth Circuit recently embraced this principle again. United States v. Hernandez-Mandujano, 721 F.3d 345, 351 (5th Cir. 2013)(citing United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir. 1999)).  And, the U.S. Supreme Court denied a writ of certiorari. Hernandez-Mandujano v. United States, --- S.Ct. ---, 2014 WL 1757843 (May 4, 2014).

In Hernandez-Mandujano, the defendant was indicted for unlawful reentry after U.S. Border Patrol Agents stopped him as he was driving on I-10.  721 F.3d 345, 347 (5th Cir. 2013).  (When the

---

supports the government's position and is in line with Fifth Circuit precedent.

agents stopped him, he admitted that he was a Mexican citizen unlawfully present in the United States.)  Hernandez-Mandujano had urged the district court to suppress all evidence deriving from his stop because the agents lacked reasonable suspicion to stop him. Id.  The district court denied the motion to suppress; thereafter, the defendant pled guilty, but preserved his right to appeal the ruling denying suppression.  Id.  On appeal, the Fifth Circuit concluded that the agents "clearly violated the Fourth Amendment in stopping Hernandez"; nevertheless, the Fifth Circuit affirmed the district court's ruling denying suppression because "neither [the defendant's] identity nor his INS file are [sic ] suppressible." Id. at 351 (quoting Roque-Villanueva).

Mr. Avelar-Castro concedes, as he must, that this authority is applicable to his circumstances.  However, he urges the Court to endorse the view of those Circuits which hold that Lopez-Mendoza simply articulated a jurisdictional principle and not a substantive one.[8]  The Court declines the defendant's invitation to disregard Fifth Circuit precedent; U.S. Fifth Circuit precedent is binding on

---

[8] See Hernandez-Mandujano, 721 F.3d at 351-356 (Jolly, J., Specially Concurring)(noting that Roque-Villanueva "precedent is based on a misapplication of the Supreme Court's holding in I.N.S. v. Lopez-Mendoza, 468 U.S. 1032 (1984)" and identifying a circuit split with respect to whether Lopez-Mendoza "recognizes a jurisdictional rule ...", as determined by the Fourth, Eighth, and Tenth Circuits, or whether it "establishes a blanket rule that a defendant's identity–and any evidence related to that identity–is never suppressible", as determined by the Third, Fifth, and Sixth Circuits).

this Court.[9]

This line of authority is an obstacle to Mr. Avelar-Castro's remedy. Even assuming (without deciding) that Mr. Rodriguez-Meraz refused to consent to the agents' entry into his house, as a matter of law, Mr. Avelar-Castro's identifying evidence that resulted from any "illegal arrest" confirming that he was an illegal alien would not be suppressible. It follows, then, that the technical application of the principles underlying Avelar-Castro's constitutional challenges would be an exercise in futility. If Avelar-Castro would not be entitled to the remedy of suppression, as a matter of law, he is not entitled to dismissal of the indictment.[10]

---

[9] Notwithstanding both Judge Jolly's concern articulated in his special concurrence -- that "allowing our erroneous interpretation of Lopez-Mendoza to persist essentially affords law enforcement officers staggering authority to detain anyone they suspect of being an illegal alien, for so long as they retrieve only evidence related to that person's identity, they will escape any ramifications for even grossly unconstitutional behavior" -- and, further, notwithstanding the Circuit split, the U.S. Supreme Court denied writs.

At oral argument, counsel for defendant lamented that, without an evidentiary hearing, the defendant will be unable to create a record that might persuade the Fifth Circuit (or, rather, ultimately, the Supreme Court) to change the law in this area. This Court has already considered and denied, with reasons, the defendant's request for an evidentiary hearing. See Order and Reasons dated May 30, 2014. The Court is sympathetic to the defendant's procedural plight but observes that, if an appellate court decides to depart from the binding line of authority this Court has applied, it is likely that the case will be remanded to apply the changed law.

[10] It is notable that the evidence of which Mr. Avelar-Castro was allegedly denied is not material to guilt or innocence.

Accordingly, the defendant's motion to dismiss the indictment is DENIED.

New Orleans, Louisiana, June 18, 2014

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE